| | |
|---|---|
| SHARNENE JOHNSON,<br>**Individually and as Personal Representative**<br>**of the Estate of Mr. DeAndre Johnson**<br>**704 57th Pl. SE**<br>**Washington, DC, 20019** | : <br> : <br> : <br> : <br> : <br> : <br> : |
| **Plaintiff** | : <br> : |
| **v.** | : <br> : |
| **DISTRICT OF COLUMBIA,** | :**JURY TRIAL DEMANDED** |
| **AND**<br>**CHIEF ROBERT CONTEE**<br>**OFFICER JUWAN JEFFERSON**<br>**AND UNKNOWN OFFICERS A and B**<br>**In their individual and official capacities** | : <br> : <br> : <br> : <br> : <br> : |
| **Serve: Mayor Muriel Bowser**<br>**1350 Pennsylvania Ave. NW**<br>**Washington, DC 20004** | : <br> : <br> : <br> : |
| **Serve: Attorney Karl Racine**<br>**441 4th Street NW**<br>**Suite 1100 South**<br>**Washington, D.C. 20001** | : <br> : <br> : <br> : <br> : |
| **Defendants.** | : <br> : |

## COMPLAINT FOR DAMAGES
## INTRODUCTION

On October 18, 2021, without probable cause or legal justification, three

Metropolitan Police Department (MPD) officers, while in the residence of DeAndre

Johnson, physically detained and arrested Mr. Johnson by initially placing one

handcuff on him and then forcing him onto the floor, at which point MPD Officer Juwan Jefferson fired two shots into the body of Mr. Johnson, killing him. At the time of his death, Mr. Johnson was unarmed and despite officer's claims[1] did not pose an imminent threat of death or serious bodily injury to the officers or anyone else present.

As the mother and personal representative of Mr. Johnson's estate, Plaintiff Sharnene Johnson brings this action in her individual capacity and on behalf of her son's estate, pursuant to 42 USC §§ 1983 and 1988, for damages and relief against the District of Columbia, Chief of Police Robert Contee III, MPD Officers Juwan Jefferson, and Unknown MPD Officers A and B in their individual and official capacity.

Plaintiff brings claims against Defendants for violation of Deandre Johnson's Fourth Amendment right to be free from unreasonable search and seizure. Plaintiff also seeks damages under the District's Wrongful Death Act and Survivor Act. In addition to federal claims, this lawsuit also alleges claims against Defendant District of Columbia for negligent supervision, retention, hiring, training and discipline; and against Defendant MPD officers for false arrest, false imprisonment; and assault and

---

[1] *See,* **Exhibit 1,** attached hereto, pg. 37, 2021 Report on Use of Force by the Washington, D.C. Metropolitan Police Department states, "On October 18, 2021, at the 1300 block of Congress Street SE officers responded to a scene where the complainant was attempting to retrieve their belongings. Once on the scene *a struggle ensued between the complainant and the subject*. Once officers intervened, a struggle then started between officers and the subject. The subject was fatally shot, and no weapon was recovered from the scene. This case was still under investigation as of May 2022."

battery.

## JURISDICTION

1.

The Court has subject matter jurisdiction of this case under 28 USC § 1331 federal question jurisdiction because Plaintiff brings this action under 42 USC § 1983 to vindicate Fourth and Fourteenth Amendments rights guaranteed by the Constitution of the United States. The Court has supplemental jurisdiction to adjudicate Plaintiff's claims arising under the laws of the District of Columbia pursuant to 28 USC § 1367 because those claims form part of the same case or controversy.

## VENUE

2.

Venue is proper under 28 USC § 1391(b)(1)-(2) because Defendants reside in this judicial district and because the events giving rise to the Plaintiff's claims took place in this district. Jurisdiction and Venue are proper.

## PARTIES

3.

Plaintiff SHARNENE JOHNSON (hereinafter "Ms. Johnson") is the mother of DeAndre Johnson and the Personal Representative of his estate. Ms. Johnson is, and at all times relevant was, a U.S. citizen and resident of Washington, D.C. Ms.

3

Johnson brings this action under D.C. and federal law for all general, special, compensatory, punitive, and permissible damages.

## DEFENDANTS

4.

Defendant, DISTRICT OF COLUMBIA ("the DISTRICT"), as a municipality, operates, manages, directs, controls MPD and District of Columbia Fire and Emergency Medical Service Department ("FEMS"), and is responsible for the policies, practices, customs, and regulations of the MPD and FEMS; and for the hiring, training, supervision, and discipline of agents, employees and MPD officers. On March 11, 2022, Ms. Johnson issued a formal notice to Mayor Muriel Bowser that she would be pursuing claims on behalf of her son's death against the District of Columbia pursuant to D.C. Code, Section 12-309. The DISTRICT may be served through Mayor Muriel Bowser at 1350 Pennsylvania Ave. N.W., Washington, D.C. 20003.

5.

Defendant ROBERT CONTEE III ("Defendant CONTEE") was sworn in as acting Chief of Police for the MPD on January 2, 2021. On May 4, 2021, he was officially confirmed as Chief of the Metropolitan Police Department. Defendant CONTEE remains in this position and has supervisory and managerial authority over MPD officers. In his role as Chief of Police, Defendant CONTEE is ultimately

responsible for the management and operation of MPD, and specifically responsible for ensuring that MPD officers comply with the color and pretense of federal and state laws, as well as the ordinances, regulations, customs, and practices of the DISTRICT and the policies of the Metropolitan Police Department.

6.

The actions of Defendant CONTEE that are the subject of this Complaint were undertaken under color of law in the regular course of his employment as a police officer of the District/and or the MPD. Defendant Contee is ultimately responsible for the policies, practices, customs, and regulations of MPD; for the hiring, training, supervision, and discipline of MPD officers; and for promulgating all orders, rules, instructions, and standard operating procedures for citizen encounters with police officers acting in their official capacity. Defendant CONTEE is sued in his individual capacity as a resident of DC.

7.

Defendants JUWAN JEFFERSON (hereinafter referred to as Defendant ("JEFFERSON") and UNKNOWN Officers A and B[2] are, and at all relevant times were, sworn MPD officers of the DISTRICT. In their capacity as police officers,

---

[2] In using "Officers A and B" as a placeholder, Plaintiff refers to the two unknown officers in the BWC. Plaintiff does not know the names of the other officers on the scene, and does not allege that only two officers are relevant to her claims. She uses the placeholder only to suggest the possibility that multiple unknown officers are relevant to this Complaint.

Defendant Jefferson and Officers A and B were responsible for policing the District under the color and pretense of the federal and state laws as well as the ordinances, regulations, and customs of MPD and the District.

8.

The actions of Defendant JEFFERSON and UNKNOWN Officers A and B that are the subject of this Complaint, were undertaken in the regular course of their employment as police officers of the MPDas employed by the DISTRICT. Defendant Jefferson and the Unknown officers are sued in their individual capacity.

9.

Defendant DISTRICT and their agents and employees, including but not limited to the MPD, Defendant CONTEE, Defendant JEFFERSON, and Unknown MPD Officers, have acted willfully, wantonly, and recklessly towards Mr. Johnson, proximately causing his injuries. Therefore, no immunity applies in this matter.

10.

Defendant District and their agents and employees, including the MPD and Defendant CONTEE, have exhibited a pattern and practice of ignoring and violating the rights of citizens through deliberate indifference related to hiring, training, supervising, and disciplining their employees, which proximately caused the injuries to Plaintiff.

11.

Defendant CONTEE individually and Defendant DISTRICT can be held liable for the violation of Mr. JOHNSON'S federal constitutional rights, pursuant to 42 USC §§ 1983 and *Montell v. Dept. of Soc. Serv.,* 436 US 658 (1978).

## FACTUAL ALLEGATIONS

### October 18, 2021, Shooting

12.

At all relevant times, Defendant JEFFERSON and Uknown Officers A and B were sworn members of the MPD and were acting under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the DISTRICT and MPD and under the authority of their office and within the scope of their employment as police officers.

13.

On October 18, 2021, DEANDRE JOHNSON was a citizen and resident of the District of Columbia and the United States of America. At all times relevant herein, DEANDRE JOHNSON had legal rights established by the Constitution of the United States and laws set forth by state and federal statutes.

14.

On October 18, 2021, Defendant JEFFERSON and Unknown Officers A and B were on duty and were present for the service of a Civil Protection Order (CPO) at 1310 Congress Pl. S.E.

15.

Defendant JEFFERSON and UNKNOWN Officers A and B were required to follow MPD General Order 304.20, which provides: MPD "members shall serve the [Civil Protection] order, but *an arrest shall not be made as the order is not violated unless served.* The respondent should be allowed to leave unless an offense other than a CPO violation was committed. Members shall inform the respondent of the requirements of the order or allow the respondent to read the order." *See,* MPD General Order, MPD. G.O., 304. 20, Civil Protection Orders, II Section 10, attached as **Exhibit 2**.

16.

On October 18, 2021, Officers Juwan JEFFERSON and other unknown officers entered DEANDRE JOHNSON'S residence along with his girlfriend, Ms. Jaquia Taylor, mother of his one-year-old son.[3]

17.

When the officers entered with Ms. Taylor to serve the CPO, she began to ask aloud why the residence was in disarray. After a brief verbal exchange, MPD officers began to surround Mr. Johnson. There was no physical contact between Ms. Taylor and Mr. Johnson.

18.

---

[3] Mr. Johnson was killed with his one year old son inside of the residence.

When Mr. Johnson asked why the police were present in the home, MPD officer Juwan JEFFERSON crossed both of his wrists in front of him as a hand signal to the other MPD officers to place Mr. Johnson under arrest.

19.

When Officer JEFFERSON gave that hand signal, DEANDRE JOHNSON had committed no crime. With no probable cause or any legal basis, Unknown MPD officers A and B placed DEANDRE JOHNSON's right hand into one handcuff and forcibly tackled him onto the living room floor of his apartment.

20.

While Mr. Jonson was lying on the floor with two MPD officers on top of him, Officer Juwon Jefferson fired two gunshots into DEANDRE JOHNSON'S body, killing him. When Defendant JEFFERSON fired his weapon inside of the apartment, both MPD officers were in his line of fire.

21.

After the shooting, MPD officers did not render any life-saving aid, did not call emergency FEMS, and DEANDRE JOHNSON was not taken to the hospital.

22.

Prior to and at the time Defendant JEFFERSON discharged his firearm, DEANDRE JOHNSON was unarmed and posed no significant threat of death or serious injury to Defendant JEFFERSON, any other persons or officers on the scene.

9

23.

Prior to and at the time Defendant JEFFERSON discharged his firearm, DEANDRE JOHNSON had not engaged in any illegal or criminal activity that justified Defendant Jefferson's use of his firearm.

24.

DEANDRE JOHNSON had a clearly established constitutional right to be free from unlawful search and seizure as guaranteed by the Fourth Amendment.

25.

In *Graham v. Connor*, the United States Supreme Court determined that all claims that law enforcement officials have used excessive force during an arrest, investigatory stop or other "seizure" of a person should be analyzed under the "objective reasonableness, standard of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. *Graham*, 490 U.S. 386, 392-399 (1989).

26.

MPD has a Use of Force ("UOF") policy that quotes the *Graham* Standard as follows: "The Fourth Amendment of the U.S. Constitution guarantees people "the right to be secure in their persons" and provides a framework in which the courts can evaluate the use of force by law enforcement officers, including the "objective reasonableness" standard established in *Graham v. Connor* 490 US 386 (1989). The

objective reasonableness acknowledges the difficult decisions that members are forced to make under rapidly evolving and unpredictable circumstances." Use of Force, Section II. Use of Force B. Specific Precautions. 901.07(B)(1)(d), attached as **Exhibit 3.**

27.

MPD's UOF policy applies to all sworn officers of the Police Department and states the following: "Members of the Metropolitan Police Department (MPD) shall value and preserve the sanctity of human life at all times, especially when lawfully exercising the use of force. In situations where the use of force is justified, the utmost restraint should be exercised. Members shall minimize the force that is used while protecting the lives of members and other persons and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." Metropolitan Police Department General Orders, MPD G.O. 2022, Use of Force, Section I. Purpose. 901.07, attached as **Exhibit 4.**

28.

The MPD's UOF policy also states that "Members shall not use force against a subject in handcuffs[4] unless the subject is actively assaulting, attempting to escape police custody, resisting members' efforts to maintain custody or control over the

---

[4] At the time of his death Mr. Johnson's right hand had been placed in one handcuff.

subject, or actively spitting on a member as authorized in Part II.B.4 of this order. In these cases, members shall limit their force response to the minimum amount of force, consistent with the use of force framework, that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control." Metropolitan Police Department General Orders, MPD G.O. 2022, Use of Force, Section II. Use of Force B. Specific Precautions. 901.07(B)(1)(d), attached as **Exhibit 5.**

29.

Upon information and belief, Mr. Johnson was never informed that a CPO was being served or that he was being arrested when his right hand was placed into handcuffs. According to an eyewitness on October 18, 2021, DEANDRE JOHNSON never made physical contact with Ms. Jaquia Taylor and never reached for, grabbed, or touched any officer's service weapon or holster. Therefore, JEFFERSON'S claim that he was in fear for his safety and that of others as a reason for firing his weapon is unreasonable in that neither of the closer two MPD officers asserted any such fear.

30.

The actions of Defendant JEFFERSON by shooting Mr. Johnson twice in the body while being restrained by one handcuff and two officers on top of him violated MPD's Use Of Force General Orders 901.07. MPD General Order, Standard

Operating Procedure, MPD GO 901.01 Use of Force, **Exhibit 6.**

31.

MPD's UOF policy states that "Members shall not use deadly force against a person unless the member reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances." Metropolitan Police Department General Orders, MPD G.O. 2022, Use of Force, Section II. Use of Force Principles. 901.07(B)(8), attached as **Exhibit 7.**

32.

The UOF policy also states: "All members who encounter a situation where the possibility of violence or resistance to lawful arrest is present shall, if possible, first attempt to defuse the situation through advice, warning, verbal persuasion, tactical communication, or other de-escalation techniques. Members shall attempt to defuse use of force situations with de-escalation techniques whenever feasible." *Id*.

33.

The UOF policy further states: "the [MPD] member may use an increasing level of force to overcome the level of resistance, as long as the force response remains proportionate to the perceived threat. Here Defendant JEFFERSON's

13

actions by shooting Mr. Johnson while he was unarmed and physically restrained on the floor by two MPD officers were unreasonable ad disproportionate to any alleged perceived threat.

34.

Defendant CONTEE, as Chief of Police of the District's MPD, is the "final authority for all policies, procedures, and activities of the department and its members." The Executive Office of the Chief of Police ("EOCOP") oversees all bureaus within the police department. Metropolitan Police Department General Order, MPD GO 101.10, Organization of the Metropolitan Police Department (MPD) attached as **Exhibit 8**.

35.

MPD has a disciplinary process for its officers, administered through the Office of Professional Responsibility (OPR). OPR's purpose is to provide investigative and disciplinary review services to ensure that the MPD is adhering to laws, regulations, and policies and to follow up on misconduct complaints.

36.

OPR is responsible for the discipline of officers, and the policy states: "MPD members shall be subject to disciplinary action for cause. OPR shall be notified of any MPD officer's conduct that includes excessive use of force."

37.

OPR reports directly to Defendant CONTEE as Chief of Police. The decision of the Chief of Police or his/her designee shall be the final administrative review of these actions.

38.

In 1999, MPD Chief Charles Ramsey created the Force Investigations Team (FIT) to investigate officer-involved fatal shootings. In 2012, MPD merged its FIT into MPD's Internal Affairs Division (IAD). In June of 2021, under the leadership of DEFENDANT CONTEE, MPD reinstated the FIT to investigate serious uses of force.

39.

IAD investigates members of the MPD for misconduct as well as fatal uses of police force. IAD also serves as the Department's liaison to the Office of Police Complaints (OPC).

40.

The Use of Force Review Board (UFRB) reviews all use of force investigations completed by IAD that result in a fatality. UFRB provides the most senior-level review of the most serious uses of force by MPD officers.

41.

In 2001, Defendant DISTRICT established the Office of Police Complaints ("OPC"). The primary function of OPC is to receive, investigate, and resolve police

misconduct complaints filed by the public against sworn officers of the Metropolitan Police Department (MPD). OPC is an independent D.C. government oversight agency whose goal is to enhance transparency regarding MPD's use of force and to increase community trust in the MPD.

42.

The Board is the governing authority of OPC and has the power to promulgate rules and implement the provisions of D.C. Official Code § 5-1107.

43.

OPC also investigates complaints alleging that a member of the MPD has engaged in harassment, discrimination, inappropriate language/conduct, retaliation, and or excessive force. When a complaint examiner sustains at least one allegation of misconduct, OPC refers the case to the Chief of Police to impose an "appropriate penalty from the Table of Penalties Guide in General Order 17-01". *See,* MPD [G.O. PER 120.21; Disciplinary Procedures and Processes. **Exhibit 9**

44.

OPC reviews police policies, procedures, and practices to ensure the District police forces are using the best practices available, with a special emphasis on constitutional policing methods. These policy reviews often result in formal and informal recommendations for improvement to the Chief of Police.

45.

Although OPC's role is to recommend improvements, CONTEE, as Chief of Police, remains the designated "final authority for all policies, procedures, activities, and discipline of the Department and its members; such authority may be delegated. Metropolitan Police Department General Order, MPD GO 101.10 Organization of the Metropolitan Police Department (MPD)  attached as **Exhibit 10**.

46.

The sanctions imposed by MPD in response to sustained community complaints suggest that the Department is reluctant to impose serious sanctions based on community complaints and often goes outside of the Table of Penalties Guide. As visualized in the graphic, the majority of sustained complaints for the past two years have resulted in reprimands or education-based development. These minor disciplinary sanctions allow officers to believe that complaints from community members are unimportant and that MPD. *See*, **Exhibit 11.**

47.

Police misconduct damages the relationship between police departments and the communities they serve. It is important that community members trust that police officers are held accountable for their wrongdoing. Community members who think that a department allows misconduct are less likely to believe that police officers wield legitimate authority making them less likely to trust officers, assist with investigations and cooperate with officers' requests.

17

48.

MPD's education-based development *is not discipline at all*, and is merely additional training. For this reason, it is not listed in the Table of Penalties Guide set forth in the General Orders. Since 2016, when the NEAR Act's was passed OPC has had the authority to refer cases to MPD for policy training. A referral for *training* is done *prior to* sustaining the complaint and is solely based on the investigation. If the allegations were deemed appropriate for training, then the case would not have been referred to the adjudication process to make a sustained merits determination. *Recently MPD's actions have further raised concerns as to the seriousness with which MPD takes OPC's sustained cases*.

49.

In 2019, Defendant JEFFERSON was investigated by IAD and sanctioned by the UFRB related to his use of force in the killing of Mr. Eric Carter. On September 16, 2019, Defendant JEFFERSON fired eighteen shots at Mr. Eric Carter striking Officer Sfoglia, in her police issued tactical vest. See, Office of the Auditor Report of MOD Use of Force. **Exhibit 12.**

50.

Although IAD and the UFRB found that Mr. Carter was armed at the time of his death and that Officer Jefferson's shooting was "justified," it also concluded that Officer JEFFERSON'S actions, specifically the reckless shooting of Officer

Sfoglia in her tactical vest, warranted discipline. Specifically, The UFRB found that Defendant JEFFERSON fired his weapon 'while other officers were in the line of sight' and recommended a "tactical improvement opportunity."

51.

A 2022 report by the Office of the Auditor reviewed IAD and UFRB's findings in four fatal shootings by MPD officers. Of the four cases, UFRB recommended additional training for *one* officer, DEFENDANT JEFFERSON. See, *Id*. The UFRB report stated that JEFFERSON was "responsible for ensuring no other persons were within his line of fire for each shot." However, both UFRB and IAD reports failed to document whether JEFFERSON ever completed the tactical opportunity. *Id.*

52.

The Auditor's report documented many investigative shortcomings in the UFRB/IAD investigation. The Report concluded that "These shortcomings were not adequately investigated by IAD and not adequately identified and analyzed in the IAD report or by the UFRB." See, **Exhibit 13 pg xiii.**

53.

For example, During the investigation, the UFRB investigator asked Officer Jefferson *highly suggestive* questions on issues that bore directly on whether Officer Jefferson complied with MPD policy, including: "*Did you not have the chance to*

*give verbal commands because of the exigency of the circumstances?"*

54.

Under the leadership of Defendant CONTEE, as Chief of Police, MPD has engaged in a widespread and persistent pattern and practice of routinely ignoring recommendations of the OPC that action be taken against officers when the UFRB has found them to have acted in a manner inconsistent with MPD policy related to improper and excessive force. In ignoring the IAD/UFRB recommendations, Defendant CONTEE provided insufficient oversight relating to enforcing the UFRB'S recommendations, thereby allowing officers to avoid accountability.

55.

Between 2014 and 2018, MPD officer-involved firearm discharges resulted in two to four reported fatalities each year. In 2021, when Deandre JOHNSON was killed by MPD, the number of officer-involved fatalities increased to five, the highest in seven years. *See*, **Exhibit 14.**

56.

The twenty incidents in which officers discharged their firearms at people in 2021 involved 22 officers in total discharging their firearms. Five of the subjects at whom officers discharged their firearms in 2021 were fatally injured. Three of these subjects reportedly pointed their weapons at officers, one subject was armed with a

20

handgun, *and one subject was resisting officers*. [5]

57.

In 2021, UFRB issued nine determinations regarding five neck restraint incidents that took place in 2019, 2020, and 2021, respectively. In these five incidents, there were eight neck restraints used. Of these neck restraints, all eight were *Not Justified, Not Within Department Policy*. One of the nine determinations was for a policy violation. The IAD's recommendation was to Sustain the policy violation, but the UFRB disagreed and found the violation to be Exonerated.

58.

The 2021 OPC report, stated: "There was an incident where an officer used force on a subject who was handcuffed. The UFRB recommended the Policy and Standards Branch conduct a policy review of General Order 901.07 to address the following: 1) Provide additional clarity that not only should the minimum amount of force be used on handcuffed prisoners, but the all over provisions of General Order 901.07, also apply to Part IV, N. (e.g. defensive tactics may not be used on an active resisting suspect; the suspect must at least demonstrative assaultive behavior); and 2) Specifically, indicate which tactics fall under each level of the Member's Force Response in the Use of Force Framework (e.g. Strikes, ASP,

---

[5] See, Exhibit 15, pg. 31; OPC 2021 MPD's Use of Force Report, This is apparently MPD's reporting DeAndre Johnson killing.

21

40mm. and ECD fall under the Defensive Tactics category). *Id*. Pg. 41.

59.

The 2021 OPC report also stated: "There was an incident where an officer discharged their firearm at a subject." The UFRB recommended the MPD incorporate into future bi-annual firearms re-qualifications the items listed below. 1) The use of a flashlight while discharging a firearm in low-light situations into the course of fire; 2) The use of cover and concealment into live firearms training during each requalification; 3) The use of effective communication and directives under high-stress situations with multiple officers on the scene. *Id.*

60.

The 2021 OPC report further stated: "On May 16, 2020, officers were called to the scene of an individual sleeping in a vehicle. Once officers approached the vehicle, the subject woke up and exited the vehicle. Upon exiting the vehicle, an officer attempted to grab the subject, who was attempting to flee. The subject became agitated, and a struggle ensued until the subject was placed in handcuffs. While handcuffed the subject was still agitated and was acting aggressively toward the officer, which led to the officer using O.C. spray on the subject. During another takedown it appeared as if the officer's right forearm was against the right side of the subject's neck." *The OPC found the use of the neck restraint to be Not Justified, Not Within Department Policy*. *Id*. Pg. 38

22

61.

Currently, the Metropolitan Police Department (MPD) is solely responsible for deciding the discipline for MPD officers for sustained allegations of misconduct based on community member complaints to the Office of Police Complaints (OPC). But this has led to an opaque system that can appear to the community as being too lenient.

63.

MPD failed to follow recommendations from the UFRB, IAD, and the OPC. Defendant CONTEE was aware of Defendant JEFFERSON's previous use of force, and he failed to impose proper discipline which led to JEFFERSON'S use of excessive force against DEANDRE JOHNSON.

64.

Here, the *Monell* claim establishes an unconstitutional custom and practice of MPD of allowing officers who are disciplined through the proper channels to escape being held accountable. Defendant CONTEE was aware that Defendant JEFFERSON used excessive force because he was: 1) notified through the IAD of the UFRB reports related to JEFFERSON's recommended discipline; and 2) received the public 2022 Bromwich report, which identified investigative problems within IAD and UFRB.

65.

Defendant CONTEE has been aware of MPD's excessive use of force since 2016 when he served as the Assistant Chief of MPD's Professional Development Bureau, which oversaw the Disciplinary Review Division. Every year an annual report on MPD's UOF has been made publically available since 2010. The supervisory officers of MPD and Chief CONTEE are aware of Officers' use of excessive force and are deliberately indifferent to the use of excessive force.

## COUNT ONE

### (*42 USC § 1983 Claims and State Law Claims*)

### (Defendant Juwan JEFFERSON, in his Individual Capacity)

66.

Plaintiff hereby incorporates the allegations in paragraphs 1-65 above, as if fully set forth herein.

67.

At the time of her son's death, SHARNENE JOHNSON had legal rights established by the Constitution of the United States, the DISTRICT, and laws set forth by state and federal statutes.

68.

At the time of his death, DEANDRE JOHNSON had legal rights established by the Constitution of the United States, the DISTRICT, and laws set forth by state

24

and federal statutes.

69.

Defendant JEFFERSON'S shooting of DEANDRE JOHNSON was a violation of DEANDRE JOHNSON's civil rights under both the United States Constitution and the United States Code, including the use of excessive and deadly force in violation of due process.

70.

Under the Fourth Amendment to the United States Constitution, DEANDRE JOHNSON was seized when he was shot by Defendant JEFFERSON, which through the application of the Fifth and Fourteenth Amendment of the United States Constitution, is also a violation District laws and regulations.

71.

Officers A and B, acting under color of law at all relevant times, acted in reckless and conscious disregard for Mr. JOHNSON's Fourth Amendment right to be free from unreasonable seizures, giving rise to Fourth Amendment claims under 42 USC § 1983.

72.

Under federal law, pursuant to 42 USC § 1983, the intentional shooting by Defendant JEFFERSON of DEANDRE JOHNSON, striking and killing him, was unreasonable and without legal justification since DEANDRE JOHNSON did not

pose a threat of death or serious bodily harm to Defendant JEFFERSON, or any others.

73.

Defendant JEFFERSON had no lawful authority to use deadly force; this shooting violated the civil rights of DEANDRE JOHNSON as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, for which Defendant JEFFERSON is individually liable.

74.

Based on Defendant JEFFERSON'S intentional unjustified shooting, which resulted in DEANDRE JOHNSON being killed, Defendant JEFFERSON'S conduct towards DEANDRE JOHNSON gives rise to state law claims and liability against him for assault, battery, and wrongful death.

75.

Based on MPD's forcibly tackling DEANDRE JOHNSON onto the floor of his residence without probable cause, reasonable articulable suspicion, or any other lawful basis, UNKNOWN officers A and B's conduct towards DEANDRE JOHNSON gives rise to state law claims and liability against them assault, battery, false imprisonment, and false arrest.

76.

In addition, because the actions of Defendant JEFFERSON were intentional,

extreme, outrageous, and reckless, causing DEANDRE JOHNSON to experience severe emotional distress, Defendant JEFFERSON'S conduct gives rise to liability to SHARNENE JOHNSON for intentional infliction of emotional distress.

77.

Due to the wrongful death suffered by DEANDRE JOHNSON, from being shot by Defendant JEFFERSON, his mother, SHARNENE JOHNSON, has lost the society and companionship of her son, which is the direct and proximate cause of the personal injury suffered in this case.

78.

The actions of Defendant JEFFERSON in shooting DEANDRE JOHNSON were not only without legal justification but done with actual malice toward DEANDRE JOHNSON and with willful and wanton indifference, and deliberate disregard for his constitutional rights, entitling his Estate to exemplary damages.

79.

Defendant JEFFERSON is not entitled to qualified immunity, because his actions were malicious, reckless, and callously indifferent to clearly established and well-settled federal and state constitutional and statutory law, which a reasonable person in his position would have known.

80.

As a direct and proximate result of the illegal search and seizure, Decedent

and his Estate suffered damages as described in the paragraphs above herein. The instant claim survives Decedent, and damages are recoverable under the District of Columbia Survivorship Act. Damages sought under this count are also proper pursuant to the District of Columbia Wrongful Death Act.

81.

As a direct and proximate result of the actions of Defendant JEFFERSON, he is liable to the Estate of DEANDRE JOHNSON for all damages allowed under DISTRICT and federal law, including damages for physical and emotional pain and suffering, medical and funeral expenses, and punitive damages.

## COUNT TWO

### 42 USC § 1983 Supervisor Liability Claims)

### (Defendant Robert CONTEE III, in his Individual Capacity)

82.

Plaintiffs hereby incorporate the allegations in paragraphs 1–81 above as if fully set forth herein.

83.

The claims against Defendant CONTEE in his individual capacity, are based on his actions and omissions in his role as Chief of Police of MPD, including his role in the enactment and promulgation of MPD policies and procedures relating to training, discipline, supervision and use of force by MPD officers.

84.

Defendant CONTEE has served as Chief of Police since January 2021 and was Chief of Police at the time of this incident. Defendant CONTEE'S actions were a contributing cause and driving force behind the actions of Defendant JEFFERSON, who remains under the supervision of Defendant CONTEE.

85.

Defendant CONTEE is liable in his individual capacity for the violation of DEANDRE JOHNSON'S constitutional rights as described herein due to his deliberate indifference, knowledge, and participation in his role as Chief of Police of a history of widespread abuses by MPD officers involving the use of force and violation of MPD policies, specifically including Defendant JEFFERSON.

86.

Defendant CONTEE is liable in his individual capacity for the violation of DEANDRE JOHNSON'S constitutional rights as described herein due to his deliberate indifference as Chief of Police to take the necessary corrective action to resolve issues relating to obvious, flagrant, and rampant violations of use of excessive force within the Metropolitan Police Department while he remains Chief of Police.

87.

Defendant CONTEE is liable in his individual capacity for the violation of

29

DEANDRE JOHNSON'S constitutional rights as described herein by creating and allowing, through his actions and omissions as Chief of Police, a policy or custom of widespread and persistent abuses by MPD officers involving the use of force and violation of MPD policies, to include a failure to investigate and discipline MPD officers, including Defendant JEFFERSON adequately.

88.

Defendant CONTEE is liable in his individual capacity for the violation of DEANDRE JOHNSON's constitutional rights as described herein due to his deliberate indifference to MPD officers violating the constitutional rights of citizens through the improper use of force, including deadly force.

89.

Prior to this shooting, Defendant CONTEE, in his role as Chief of Police, was aware that Defendant JEFFERSON had a history of violating the constitutional right of citizens, including at least one prior UFRB finding that Defendant Jefferson should be sanctioned for the reckless use of his firearm that resulted in the shooting of another MPD officer.

90.

Prior to this shooting, Defendant CONTEE in his role as Chief of Police was aware that Defendant JEFFERSON had a history of violating the work rules of the DISTRICT Police Department. In 2021, following an investigation by IAD, a

30

determination was made by the UFRB that Defendant JEFFERSON should be sanctioned when he failed to ensure his line of sight was clear at the time he discharged his weapon. According to reports, JEFFERSON was only *educationally counseled,* even though she should have been subjected to discipline by Defendant CONTEE through MPD's Table of Offenses Guide.

91.

The UFRB's review of Defendant JEFFERSON found that he had violated MPD's policy requiring "an officer to take note when another officer is in the line of sight" before firing his weapon. However, it is unclear whether Defendant CONTEE rejected the finding of OPC BECAUSE  the IAD report never included whether or not JEFFERSON completed the sanction, tactical opportunity. [6]

92.

Defendant CONTEE, in his role as Chief of Police, permitted, maintained, condoned, and ratified a system and review of investigations of police misconduct allegations involving the use of force that is so cursory and lacking in thoroughness that it is ineffective and biased in favor of officers over citizen complainants, and which has led to the foreseeable result of tolerating and contributing to the improper use of force by MPD officers.

93.

---

[6] See, Exhibit 13.

31

The custom, policies, and practices described herein, and attributed to the actions and omissions a Defendant CONTEE in his role as Chief of Police, were a direct contributing cause and driving force leading to the violation of DEANDRE JOHNSON'S civil and constitutional rights.

94.

Defendant CONTEE in his individual capacity, is not entitled to qualified immunity, because his actions as shown herein, were deliberately indifferent, with knowledge and acquiescence, regarding clearly established and well-settled federal and state constitutional and statutory law, which a reasonable person in his position would have known.

95.

As a direct and proximate result of the actions of Defendant CONTEE, he is liable to SHARNENE JOHNSON for all damages allowed under DISCTRCT and federal law, including damages for physical and emotional pain and suffering, medical expenses, and punitive damages.

## COUNT THREE

### (*42 USC § 1983* **Municipal Liability Claims**)

### **(Defendant DISTRICT)**

96.

Plaintiffs hereby incorporate the allegations and paragraphs 1 – above as if fully set forth herein.

### *MPD's Duties Under* 6A DCMR 207

Defendants owed DEANDRE JOHNSON a duty of reasonable care to use only the minimal amount of force necessary to apprehend him. Under this duty of care, Defendants were to resort to using firearms to effect apprehension only if the officers: exhausted all other reasonable alternative means of doing so; were seeking to arrest DEANDRE JOHNSON for a felony they reasonably believed could result in death or serious bodily injury; and would not endanger the lives of others in using their firearms.

Defendants owed Mr. JOHNSON a duty to refrain from using their firearms except for the purposes of defending against an attack they had reasonable cause to believe could result in their death or serious bodily injury.

97.

As shown herein, the actions, omissions, systemic flaws, policies, and customs of Defendant DISTRICT, through the MPD, have caused police officers to believe that the use of excessive, deadly, or unreasonable force would not be properly, aggressively and thoroughly investigated, which has led to the foreseeable result that officers were likely to use excessive and unreasonable force against citizens in the future.

98.

Defendant DISTRICT failed to adequately train, supervise, and oversee its officers. This, combined with its further failure to enforce its own policy guidelines, led to a custom and practice of widespread and illegal use of deadly force by MPD officers. Moreover, the DISTRICT knew or should have known that MPD officers commonly use excessive deadly force but failed to address these widespread violations of individuals' constitutional rights.

99.

At all times relevant to the instant lawsuit, it was the policy, practice, and custom of D.C.'s MPD to encourage and permit officers to use excessive deadly force to seize citizens when patrolling majority-Black areas of D.C. *See,* **OPC report MPD's Use of Force 2020; Exhibit 17.**

100.

At all times relevant to the instant lawsuit, it was the policy, practice, and custom of D.C.'s MPD to employ a police code of silence, where officers and supervisors cover up instances of unjustified deadly force by fabricating accounts in police reports and internal affairs investigations presented to the public with the intention of falsely exonerating officers from potential civil liability.

101.

Years before this shooting, Defendant DISTRICT, through the MPD and

District Lawmakers, allowed a persistent and widespread practice of condoning, ratifying and authorizing certain officers, including Defendant JEFFERSON, to cover up and justify the use of excessive force despite the lawful authority to use such force.

102.

Years before this shooting, Defendant CITY OF DISTRICT, through the DISTRICT Police Department and District Lawmakers, were aware of, and deliberately indifferent to widespread and systemic corruption and work rule violations within the DISTRICT Police Department, including violations relating to the use of force and other violations of the constitutional rights of citizens.

103.

Years before this shooting, Defendant CITY OF DISTRICT, through the DISTRICT Police Department and District Lawmakers, were deliberately indifferent to this practice and custom within the DISTRICT Police Department, by failing to enforce policies; failing to properly train; failing to properly discipline, and thus, creating a culture within the City DISTRICT Police Department wherein violating citizen's civil rights is not only tolerated, and encouraged; thereby allowing the deprivation of DEANDRE JOHNSONS civil and constitutional rights, as described herein.

104.

35

Years before this shooting, Defendant DISTRICT, through the MPD and City Lawmakers, were engaged in a persistent and widespread practice of ratifying and condoning the unlawful and illegal activity of the DISTRICT Police officers, including Defendant JEFFERSON, thereby allowing the deprivation of DEANDRE JOHNSON'S civil and constitutional rights, as described herein.

105.

The custom, policies, and practices described herein, and attributed to Defendant DISTRICT, were a contributing cause and driving force leading to the violation of DEANDRE JOHNSON'S civil and constitutional rights.

**COMMON LAW CLAIMS: WRONGFUL DEATH AND SURVIVORSHIP**

**Count FOUR: Wrongful Death - Battery;  Count FIVE: Survivorship – Battery;**

**Count SIX: Wrongful Death – Assault;  Count SEVEN: Survivorship – Assault**

**(Against Defendant Officers and D.C.)**

106.

Plaintiff incorporates by reference paragraphs through1-105 above as if fully set forth herein.

107.

Officers A and B, in deliberately and forcibly tackling Mr. Johnson onto the

floor while handcuffed, intentionally and unlawfully attempted and threatened physical harm to DEANDRE JOHNSON.

108.

Defendant JEFFERSON deliberately killed Mr. Johnson by shooting him twice while on the floor, intentionally causing harmful bodily contact to DEANDRE JOHNSON.

109.

No reasonably prudent police officer would have believed that DEANDRE JOHNSON'S actions placed Officers JEFFERSON, A and B or any other persons in imminent peril of death or serious bodily harm. As a direct and proximate cause of Defendants' actions, Decedent and his Estate suffered damages described herein.

110.

All damages were proximately caused by the intentional actions of Defendant JEFFERSON and Other Unknown Officers with no identifiable provocation from Mr. Johnson.

111.

At all times during this tortious act, Defendant Officers were employed as police officers by Defendant District of Columbia, were on duty, and used firearms owned by the DISTRICT.

112.

At all times during this tortious act, Officers JEFFERSON, A and B were acting within the scope of their employment as police officers for D.C. and acting as agents of, with the assent of, for the benefit of, and under the control of D.C., with the intent to further the District's policy, practice, and custom of deliberate indifference to excessive force.

113.

Therefore, D.C. is liable under the doctrine of respondeat superior for the aforementioned assault and battery by Defendant Officers.

114.

The instant claim survives Decedent, and damages are recoverable under the District of Columbia Survivorship Act. Damages sought under this count are also proper pursuant to the District of Columbia Wrongful Death Act.

## Count EIGHT: Wrongful Death and
## Count NINE: Survivorship Common Law Negligence in Supervising and
## Retaining Officers JEFFERSON and UNKNOWN OFFICERS A and B
## (Against Defendant Officers and D.C.)

115.

Plaintiff incorporates by reference paragraphs 1- 114 as if fully set forth herein.

116.

At all times relevant to this case, Officers JEFFERSON, A and B acted within

the scope of their duties as employees of MPD and the District.

117.

The DISTRICT had a duty to properly hire, train, supervise, discipline, and— where necessary— terminate its personnel in order to protect the public against dangers reasonably likely to result from the absence of proper hiring, supervision, and firing.

118.

Upon information and belief, Officers JEFFERSON A and B were under the command of Defendant CONTEE when they forcibly tackled and killed DEANDRE JOHNSON.

119.

Defendant CONTEE had a duty to properly supervise and control Officers JEFFERSON, A and B to protect the public against dangers reasonably likely to result from the absence of proper supervision and control.

120.

The District and Defendant CONTEE knew or should have known of prior instances of dangerous or incompetent behavior by Officers JEFFERSON A and B.

121.

The District and Defendant CONTEE, armed with the above information, breached their duties to the public—including DEANDRE JOHNSON—by failing

to adequately hire, supervise, control, discipline, or terminate JEFFERSON and Officers A and B. Defendants' breach of these duties directly and proximately caused DEANDRE JOHNSON'S injuries and death.

122.

The instant claim survives Decedent, and damages are recoverable under the District of Columbia Survivorship Act and are also proper pursuant to the District of Columbia Wrongful Death Act.

**Count TEN: Wrongful Death; Count ELEVEN: Survivorship Common Law Negligence in Training Officers JEFFERSON, A and B**

**(Against Defendant Officers and D.C.)**

123.

Plaintiff incorporates by reference paragraphs 1-122 as if fully set forth herein.

124.

At all times relevant to this case, Officers JEFFERSON, A and B acted within the scope of their duties as employees of MPD and the District.

125.

The DISTRICT and Defendant CONTEE had a duty to use reasonable care in training MPD personnel, including but not limited to training, education, evaluation, and corrective action against officers in line with governing federal and local laws and regulations.

40

126.

Defendants the DISTRICT and Defendant CONTEE knew or should have known that subordinate officers commonly used excessive force when interacting with the public but failed to adequately train, educate, evaluate, and take corrective action against those officers, thereby breaching their duty.

127.

The DISTRICT further breached its duty of care to DEANDRE JOHNSON by failing to use reasonable care in providing training consistent with local and national standards.

128.

Defendants' breach of these duties directly and proximately caused DEANDRE JOHNSON'S injuries and ultimate death.

129.

The instant claim survives Decedent and damages are recoverable under the District of Columbia Survivorship Act and are also proper pursuant to the District of Columbia Wrongful Death Act.

**Count TWELVE: Wrongful Death; Count THIRTEEN: Survivorship Common Law Negligence Leading to the Death of DEANDRE JOHNSON (Against Officers)**

41

130.

Plaintiff incorporates by reference paragraphs 1-129 as if fully set forth herein.

131.

At all times relevant to this case, Officers JEFFERSON A and B acted within the scope of their duties as employees of MPD and the District.

132.

After shooting DEANDRE JOHNSON, the officers failed to provide first-aid services and failed to promptly relay the urgent need for medical support to FEMS.

133.

Defendants JEFFERSON, A and B owed DEANDRE JOHNSON a duty to exercise reasonable care, including using only the minimum amount of force necessary against him, exhausting every other reasonable means of apprehension or defense before resorting to the use of firearms, and calling emergency services immediately after a shooting occurs, as per MPD policy.

134.

Defendants JEFFERSON A and B forcibly tackled DEANDRE JOHNSON without cause and, upon information and belief, failed to inform him that he was being arrested. Officers JEFFERSON, A and B did not attempt to use de-escalation or other reasonable means of apprehension or defense prior to shooting DEANDRE JOHNSON multiple times.

135.

MPD has claimed that DEANDRE JOHNSON got into a physical struggle with [Jaquia Taylor] and that the struggle continued with the officers.

136.

The BWC footage does not support this claim, and a witness on the scene denies that DEANDRE JOHNSON made any physical contact with Jaquia Taylor or attempted to touch any officer's weapon or holster. MPD has provided inaccurate accounts pertaining to DEANDRE JOHNSON'S death that are refuted by the redacted BWC released to the public.[7]

137.

Upon information and belief, Officers JEFFERSON A and B failed to provide first-aid services to DEANDRE JOHNSON after forcibly tackling and shooting him.

138.

Upon information and belief, DEANDRE JOHNSON'S body remained on the scene, FEMS did not respond, and the Office of the Chief Medical Examiner pronounced him dead.

139.

Defendant JEFFERSON failed to exercise reasonable care and violated the

---

[7] *See*, https://app.box.com/s/3rwhvqs0g4kjx7bp71j773mta151acl8

acceptable standard of care in serving a CPO, and forcibly tackling DEANDRE JOHNSON without good cause; unreasonably perceiving him as a threat; and failing to provide aid to DEANDRE JOHNSON after shooting him twice.

140.

As a proximate cause of these acts and omissions, DEANDRE JOHNSON sustained serious bodily injury and endured great pain, suffering, and mental anguish from the time he was forcibly restrained until his death.

141.

The instant claim survives Decedent, and damages are recoverable under the District of Columbia Survivorship Act and are also proper pursuant to the District of Columbia Wrongful Death Act.

**Count FOURTEEN: False Arrest; Count FIFTEEN: False Imprisonment**

**(Against All Officers)**

142.

District of Columbia law proscribes false arrest or false imprisonment, defined as unlawful detention or restraint of an individual against the individual's will.

143.

Unknown Officers A and B committed false arrest or false imprisonment when they restrained and detained DEANDRE JOHNSON without a warrant or

probable cause on October 18, 2021. DEANDRE JOHNSON was not engaged in illegal activity, took no actions that a reasonable officer could have believed were unlawful.

144.

Defendant Unknown Officers A and B, acted with intent to injure, or in willful disregard for the rights of DEANDRE JOHNSON and their conduct was outrageous or reckless toward the safety of DEANDRE JOHNSON

145.

Defendant DISTRICT is liable under the doctrine of respondeat superior for the damages inflicted by its agent Unknown Officers A and B who were acting within the scope of their employment as MPD officer sand on behalf of and in the interests of their employer.

## COUNT SIXTEEN

### (Claim for Attorney's Fees Against all Defendants)

142.

Pursuant to 42 USC § 1988, Plaintiffs are entitled to an award of reasonable attorneys' fees, expert costs, and other costs of litigation.

**WHEREFORE**, Plaintiff, SHARNENE JOHNSON prays for a judgment against Defendants as follows:

a)    That process issue and that Defendants be served according to the

law;

b)    That Plaintiff has a trial by jury;

c)    That Plaintiff has and recover a verdict and judgment against Defendant for all compensatory general and punitive damages, in the amount of one hundred million dollars, and reasonable attorney fees pursuant to 42 USC § 1988, and for all such amounts as may be proven before the trier of fact; and

d)    That Plaintiff has such other, and further relief as this Court deems just and proper under the circumstances.

s/ Brandi Harden

Brandi Harden
Harden | Law, PLLC
Bar No. 470706
400 7th Street Suite 604
Washington, DC 20004
b@hardenlawoffices.com
(202) 621-8268
*Attorney for Plaintiff*