## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **SHARNENE JOHNSON,** |
| **Plaintiff,** |
| **v.** |
| **DISTRICT OF COLUMBIA,** *et al.***,** |
| **Defendants.** |

**Civil Action No. 22-3167 (JEB)**

## <u>MEMORANDUM OPINION</u>

While escorting a domestic-violence victim back to her apartment several years ago, Metropolitan Police Department officers engaged in a physical struggle with the offender, DeAndre Johnson, which culminated in Officer Juwan Jefferson's fatally shooting him. Plaintiff Sharnene Johnson, Johnson's mother and the executor of his estate, brought this suit against Jefferson, MPD Officers Lauren Chrismer and Nizam Ahmed, MPD Chief Robert Contee, and the District of Columbia, raising a Fourth Amendment excessive-force claim alongside common-law tort claims. In an earlier Opinion, the Court dismissed a portion of Plaintiff's suit, and the parties settled as to another piece. Now, after nearly two years of discovery, Defendants move for summary judgment as to all of Plaintiff's remaining claims, as well as on the issue of damages. The Court will grant the Motion in part and deny it in part.

## I.    Background

### A.    <u>Factual Background</u>

The lead-up to the shooting is both largely undisputed and corroborated by the officers' Body Worn Camera (BWC) footage. Where there are factual disputes, the Court considers the evidence in the light most favorable to Plaintiff. On October 18, 2021, Chrismer, Jefferson, and Ahmed were dispatched to Johnson's apartment, where he lived with his girlfriend Jaquia

1

Taylor, her daughter, and their son.  See ECF No. 81-1 (Def. Rep. to Statement of Facts), ¶¶ 7, 36.  The officers were there to provide a police escort for Taylor as she returned to the apartment to collect her belongings.  Id.  Two nights prior, amidst an argument, Johnson had taken out a gun and held it to Taylor's head.  Id., ¶ 3.  She had called the police shortly after the incident that night, but Johnson had left before they arrived.  Id., ¶ 6.  The assault prompted MPD to issue a Be on the Lookout (BOLO) for Johnson.  Id., ¶ 5.

While waiting for Taylor outside the apartment building, the three officers reviewed Johnson's BOLO, which contained his photo.  Id., ¶¶ 5, 9.  Upon seeing the photo, Chrismer remarked, "I've seen him so many times."  Id., ¶ 10; ECF No. 79-1, Exh. 14 (Chrismer BWC) at 16:41:20–29.

Taylor then arrived with her two children, see Chrismer BWC at 16:45:46–55, and led the way upstairs to her and Johnson's fourth-floor apartment while the officers followed closely behind.  Id. at 16:47:14–48:10.  When the group entered the unit, they found it in disarray.  Id. at 16:48:20–24.  Johnson was standing in the living room, and he and Taylor immediately began to argue; Johnson asked Taylor repeatedly for his money, while Taylor asked what he had done to the apartment.  Id. at 16:48:21–58.  Taylor then walked into the bedroom at the back of the apartment with her children, where they would remain until after the shooting.  Id. at 16:49:04–08, 16:49:38–45.  Officer Ahmed positioned himself to stop Johnson from approaching Taylor in the back of the apartment, leaving Johnson standing between Ahmed and Jefferson in the living room as he continued to yell in Taylor's direction.  Id. at 16:49:01–04.

Jefferson then signaled for the officers to arrest Johnson, placing a handcuff on Johnson's right wrist.  See Def. Rep. to SOF, ¶¶ 10–11, 17; Chrismer BWC at 16:49:05–07; ECF No. 79-1, Exh. 11 (Ahmed BWC) at 16:49:04–09.  Ahmed attempted to do the same to Johnson's left

2

wrist, but Johnson pulled his arm away.  See Ahmed BWC at 16:49:08–12; Def. Rep. to SOF,

¶¶ 11, 18.  Chaos ensued.

According to Plaintiff's interpretation of the videos, after Ahmed failed to handcuff

Johnson, the officers executed a "tactical takedown" to subdue him, tackling him to the floor.

See Def. Rep. to SOF, ¶ 19.  Defendants contest this and assert that Johnson, Ahmed, and

Jefferson tripped over a dog kennel and fell to the floor.  Id.  The BWC footage sheds little light

on this issue, but in either case, the three men all ended up struggling on the ground, with

Johnson underneath the officers.  See Chrismer BWC at 16:49:14–17.

In the footage, the three scuffle on the floor for a few moments.  Id. at 16:49:17–25;

Ahmed BWC at 16:49:16–26.  Then, as the parties agree, Ahmed shouted, "He's got my, he's

got my!"  Def. Rep. to SOF, ¶ 22.  Before Ahmed could finish his statement, Jefferson took out

his gun and shot Johnson twice in the back.  Id., ¶ 23.

What happened in those few seconds — between the three men ending up on the floor

and Jefferson shooting Johnson in the back — is unclear yet critical to this lawsuit and our

Motion.  Astoundingly, across three sets of BWC footage, there is no video evidence that clearly

depicts what actually happened.  The parties vehemently dispute whether Johnson was grabbing

at Ahmed's gun and whether he could have possibly opened the holster's safety mechanism to

access the firearm.  Id., ¶ 20.  Ahmed stated that he saw Johnson pull on his holster, which is

why he shouted.  Id., ¶¶ 20–21.  Plaintiff contends that Johnson was not reaching for Ahmed's

gun and could not have undone the safety mechanism, and thus he did not pose a threat at the

time he was killed.  See ECF No. 79 (MSJ Opp.) at 29.  Jefferson acknowledged that he did not

see Johnson's hands during the struggle and that he did not see Johnson grab the gun.  See Def.

Rep. to SOF, ¶ 22.

The officers and Taylor proceeded to provide first aid to Johnson until EMS arrived, <u>see</u> Chrismer BWC at 16:50:35–16:56:24, but to no avail — he was pronounced dead at the scene shortly thereafter.  <u>See</u> ECF No. 79-1, Exh. 1 (MPD Internal Report) at 7.

       B.    <u>Procedural Background</u>

A year later, Sharnene Johnson, the decedent's mother and personal representative of his estate, brought this lawsuit, alleging a combination of constitutional and common-law violations by Jefferson, Ahmed, Chrismer, Chief Contee, and the District of Columbia.  <u>See</u> ECF No. 45 (Second Am. Compl.), ¶¶ 28–121.  For clarity, this Court will refer to Sharnene Johnson as Plaintiff, and DeAndre Johnson as Johnson.  In a previous Opinion, the Court dismissed Plaintiff's § 1983 municipal-liability and supervisory-liability claims against the District and Contee respectively, as well as Plaintiff's negligent use-of-force claims.  <u>Johnson v. District of Columbia</u>, 2023 WL 2770392, at *9 (D.D.C. Apr. 4, 2023).  The parties have also since stipulated to the dismissal of all claims against Chrismer and all claims relating to negligent medical care.  <u>See</u> ECF No. 68 (Stip. Dismissal) at ECF p. 1.  Here is what remains: a § 1983 excessive-force claim against Jefferson alone; assault and battery claims against Jefferson, Ahmed, and the District; false-arrest claims against Jefferson, Ahmed, and the District; and negligent-supervision claims against Contee and the District.  <u>See</u> ECF No. 70 (MSJ) at 11.

Defendants now move for summary judgment as to all of these, and as to the types of damages Plaintiff should be permitted to seek at trial.  <u>Id.</u> at 1.

## II.    Legal Standard

Courts must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the substantive outcome of

litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence presented would permit a reasonable jury to return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In viewing this record, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006). The court, in turn, must "eschew making credibility determinations" and avoid "weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant must put forth evidence that would permit a reasonable jury to find in his favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    Analysis

The Court considers each outstanding claim in turn and concludes with damages.

### A.    Excessive-Force Claim

Count I invokes 42 U.S.C. § 1983, asserting that Jefferson's killing of Johnson constituted excessive force in violation of the Fourth Amendment. See Second Am. Compl., ¶¶ 28–36. Defendants contend that they are entitled to summary judgment on this claim because

Jefferson is shielded by qualified immunity.  See MSJ at 8, 20.  This doctrine protects "officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Hedgpeth v. Rahim, 893 F.3d 802, 806 (D.C. Cir. 2018) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). Functionally, courts break this analysis into two separate inquiries: was there a violation of a constitutional right, and, if so, was that violated right "clearly established"?  See Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982); see also Pearson v. Callahan, 555 U.S. 223, 231 (2009). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."  Pearson, 555 U.S. at 236.  Indeed, when the constitutional-violation question is difficult to answer, many courts opt to resolve qualified-immunity claims on the "clearly established" prong alone.  As the Court finds for Jefferson on the latter, it could take this route; instead, however, it will undertake a full analysis of both prongs because the constitutional-violation analysis bears on Plaintiff's assault and battery claims discussed later on.

### 1.  *Constitutional Violation*

The Court thus begins by assessing whether Jefferson's use of his weapon constituted excessive force in violation of Johnson's Fourth Amendment rights.  Recognizing that some degree of force is needed to effectuate policing, the Supreme Court has held that an officer's use of force violates the Fourth Amendment only when it is objectively unreasonable.  Barnes v. Felix, 605 U.S. 73, 76 (2025) (citing Graham v. Connor, 490 U.S. 386, 397 (1989)).  At summary judgment, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the

reasonableness of [the officer's] actions . . . is a pure question of law." <u>Scott</u>, 550 U.S. at 381 n.8.

In analyzing objective reasonableness, courts balance the intrusion on a plaintiff's Fourth Amendment interests with the government's interest in safety and effective policing. <u>Id.</u> Although the effect of deadly force on one's Fourth Amendment rights is "unmatched" in severity, <u>Tennessee v. Garner</u>, 471 U.S. 1, 10 (1985), the Supreme Court has held that such force can still be objectively reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." <u>Id.</u> at 11. Courts must evaluate the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396. In assessing the facts, this Court remains mindful that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396–97.

Here, viewing the facts in the light most favorable to Plaintiff, the Court cannot conclude that Jefferson's use of deadly force was objectively reasonable as a matter of law. Although the parties strongly disagree as to several facts — whether Johnson grabbed the gun, whether the holster's safety mechanism would have prevented access, whether Ahmed reasonably perceived him to be grabbing the gun — much of this is irrelevant. This is because the objective-reasonableness inquiry requires the Court to concentrate not on what actually happened in the struggle, but on what information Jefferson possessed when he chose to use deadly force. <u>Garner</u>, 471 U.S. at 11 (concluding that reasonableness of deadly force depends on what officer had "probable cause to believe"); <u>Barnes</u>, 605 U.S. at 80 ("[D]eciding whether a use of force was objectively reasonable demands 'careful attention to the facts and circumstances' relating to the

7

incident, <u>as then known to the officer</u>.") (quoting <u>Graham</u>, 490 U.S. at 396).  In other words, what did Jefferson know, and would a reasonable officer equipped with that information also have shot Johnson?

Here is what Jefferson knew.  Two days prior to their encounter, Johnson had committed an assault with a deadly weapon.  <u>See</u> Def. Rep. to SOF, ¶ 3.  Just before the shooting, he had resisted arrest.  <u>Id.</u>, ¶ 18.  And right before Jefferson discharged his weapon, Ahmed had shouted, "He's got my!"  <u>Id.</u>, ¶ 22.  Jefferson has stated, and the parties agree, that he believed that Ahmed was going to say, "He's got my gun!"  <u>Id</u>.  As to the information Jefferson did <u>not</u> possess, the parties are again in agreement: during the scuffle, Jefferson never saw the gun, and he never saw whether Johnson was grabbing for the gun before shooting him.  <u>Id.</u>  So, the question remains whether the use of deadly force was reasonable under these circumstances.

To begin, when viewed in the light most favorable to Plaintiff, Jefferson's firsthand perceptions during the struggle did not clearly justify the use of deadly force.  He stated that he never saw Johnson grabbing Ahmed's gun.  <u>Id.</u>  Although Johnson was struggling with the officers, Defendants concede that "struggle itself does not justify deadly force."  MSJ at 22–23.  In other words, Jefferson did not personally perceive anything that warranted his immediately shooting Johnson.  <u>Compare</u> <u>City & County of San Francisco v. Sheehan</u>, 575 U.S. 600, 613 (2015) (deadly force reasonable where shooting officer saw suspect with knife and heard her threaten to kill others); <u>Bushrod v. District of Columbia</u>, 521 F. Supp. 3d 1, 24 (D.D.C. 2021) (deadly force reasonable where suspect purposely struck shooting officer with car door), <u>with</u> <u>Young v. District of Columbia</u>, 322 F. Supp. 3d 26, 37 (D.D.C. 2018) (deadly force unreasonable where suspect raised his empty hands in the air to surrender).

Instead, Jefferson confirmed in his deposition that he had relied primarily on Ahmed's exclamation in deciding to use deadly force.  See Def. Rep. to SOF, ¶ 22.  But Ahmed's statement was incomplete and ambiguous; its meaning depends on what word comes at the end of "He's got my!" Although Jefferson stated in his deposition that he believed that "gun" was how Ahmed intended to finish his exclamation, id. at 23, it is not clear that a reasonable officer would have immediately jumped to deadly force from Ahmed's ambiguous statement without further evidence that Johnson posed a threat.  Cf. Campbell v. Cheatham Cnty. Sheriff's Dep't, 47 F.4th 468, 480 (6th Cir. 2022) ("[T]he fact that an individual states that he has a weapon, or even in fact possesses a weapon, is not enough to justify the use of deadly force[;] . . . [r]ather, there must be additional indicia that the safety of the officer or others is at risk.").

Defendants contend that because Jefferson could not see Johnson's hands, Ahmed's statement was all he had to go on to evaluate Johnson's dangerousness; there was no time to investigate further.  See MSJ at 17–18.  But not having time to further evaluate the situation is different from not taking the time to evaluate it.  Video footage indicates that Jefferson shot Johnson instantaneously after Ahmed exclaimed, so quickly that Ahmed could not even finish his statement before the shooting.  See Ahmed BWC at 16:49:16–26; Def. Rep. to SOF, ¶ 23 ("Before Ahmed could say 'gun,' Officer Jefferson fired two shots, striking Johnson and killing him.").  Resolving all inferences in Plaintiff's favor, the Court believes that upon hearing Ahmed's shout, a reasonable officer would have further evaluated Johnson's dangerousness before using deadly force, even though the event unfolded very quickly.  After all, he was next to Johnson and Ahmed during the struggle and could perceive what was happening in front of him. See Ahmed BWC at 16:49:16–26.

The final pieces of information that Jefferson possessed — namely, his knowledge of Johnson's ADW from two nights prior and the fact that he was resisting arrest right before the shooting — do not alter the outcome.  While Defendants do not contend that either incident standing alone justifies the shooting, they argue that this "combined" context of resistance and prior violence, taken along with Ahmed's statement, gave Jefferson probable cause to believe that Johnson posed a serious threat.  See MSJ at 23.  That argument, too, does not carry the day.  There is no doubt that courts must consider the totality of circumstances in assessing the objective reasonableness of an officer's actions.  Barnes, 605 U.S. at 76.  For example, "[p]rior events may show why a reasonable officer would perceive otherwise ambiguous conduct as threatening, or instead as innocuous."  Id. at 73–74.  The issue here, however, is that these specific prior events make it only marginally more reasonable for Jefferson to believe that Johnson was grabbing at Ahmed's gun when he shot him.

Start with Johnson's resisting arrest.  This fact tells us little about whether he posed a serious and immediate threat; that depends entirely on the nature of his resistance.  See MSJ at 22–23 (acknowledging "struggle itself does not justify deadly force"); see also Masel v. Barrett, 1988 WL 36149, at *5 (D.D.C. Apr. 8, 1988) ("[E]ven if . . . plaintiff did offer some resistance, that would not automatically render reasonable any level of physical violence with which an arresting officer responded.").  While Defendants cite to cases where, in resisting arrest, suspects had behaved dangerously — e.g., striking an officer with their car, see MSJ at 22–23 (citing Bushrod, 521 F. Supp. 3d at 24), or lifting their shirt to put a hand on their gun, id. (citing Romero v. City of Lansing, 2024 WL 4223961, at *6 (W.D. Mich. Sep. 18, 2024)), these citations miss the point: deadly force was reasonable in those cases not because those suspects were resisting arrest, but because they had behaved dangerously.  Defendants focus on the fact

that Johnson was actively struggling with the officers to argue that the "close proximity and struggle [created by Johnson's resistance] justified quick action by the officers." Id. Sure. But that does not explain why the "quick action" taken had to involve immediate and deadly force.

As for the ADW from two nights prior, it is not enough to say, as Defendants do here, that the prior incident indicates that Johnson was a violent individual and thus more likely to have been dangerous. Id. at 24. While courts may consider the nature of the crime giving rise to a police encounter in evaluating the reasonableness of deadly force, Graham, 490 U.S. at 396, they do so in service of paying "careful attention to the facts and circumstances of each particular case." Id. "[P]olice officers are [only] justified in firing at a suspect in order to end a severe threat to public safety . . . until the threat has ended." Plumhoff v. Rickard, 572 U.S. 765, 777 (2014). The fact that Johnson posed a threat two nights ago does not mean he posed one here. Flythe v. District of Columbia, 791 F.3d 13, 22 (D.C. Cir. 2015) ("Justification for deadly force exists only for the life of the threat."). All of the cases cited by Defendants, where prior crimes bolstered the reasonableness of deadly force, involved individuals threatening officers with the very guns they used to commit crimes just prior to their police encounters. See MSJ at 23 (citing Romero, 2024 WL 4223961, at *7; Thorton v. City of Columbus, 727 F. App'x 829, 837 (6th Cir. 2018)). Johnson, conversely, was unarmed when Jefferson shot him, and his crime occurred two days prior.

Taken all together, and viewed in the light most favorable to Plaintiff, this context and Ahmed's statement do not add up to probable cause for Jefferson to believe that Johnson posed a threat that warranted the use of deadly force. The Court thus cannot say as a matter of law that Jefferson's use of deadly force was objectively reasonable.

2.    *Clearly Established Law*

The next prong of the qualified-immunity analysis asks whether the violated constitutional rights were clearly established.  A right is clearly established when its "contours [a]re sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  Plumhoff, 572 U.S. at 778–79.  A court assesses whether a legal right is clearly established by looking for "cases of controlling authority in [its] jurisdiction" or "a consensus of cases of persuasive authority."  Wilson v. Layne, 526 U.S. 603, 604 (1999).  The D.C. Circuit has held that the plaintiff bears the burden of showing that the right at issue is clearly established.  Dukore v. District of Columbia, 799 F.3d 1137, 1145 (D.C. Cir. 2015).

Here, Plaintiff does not meet that burden.  She cites cursorily to Graham for the basic proposition that the Fourth Amendment "prohibits officers from using more force than reasonably necessary."  MSJ Opp. at 29.  But the Supreme Court has repeatedly warned that clearly established law is not to be evaluated at "a high level of generality."  Plumhoff, 572 U.S. at 778–79; accord Mullenix, 577 U.S. at 12.  This is especially true in the excessive-force context, where reasonableness "depends very much on the facts of each case."  Kisela v. Hughes, 584 U.S. 100, 104 (2018).  To be sure, Plaintiff "need not identify cases with 'materially similar' facts," but she needs to show how "the state of the law at the time of the incident" could have given Jefferson "fair warning that his alleged misconduct was unconstitutional."  Johnson v. District of Columbia, 528 F.3d 969, 976 (D.C. Cir. 2008) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002) (alterations omitted)).

Unfortunately for Plaintiff, there is little in our caselaw that offers help.  Our precedent has established that the force used to effectuate an arrest is excessive when it serves no purpose

— commonly, when the individual is already subdued or in handcuffs.  See Johnson, 528 F.3d at 977 (collecting cases); Ingram v. Shipman-Meyer, 241 F. Supp. 3d 124, 141 (D.D.C. 2017) (same).  It is undisputed here that Johnson was neither handcuffed nor subdued.  See Ahmed BWC at 16:49:17–25.  Whatever rights those cases clearly establish, they do not apply here.

The same is true for the lines of cases finding deadly force excessive where the individual clearly did not pose a threat.  See Young, 322 F. Supp. 3d at 37 (excessive-force violation clearly established where police shot man whose hands were in the air); Flythe, 791 F.3d at 20 (excessive-force violation clearly established where police shot man who was visibly unarmed and did not pose threat).  Even under Plaintiff's version of the facts, it was unclear to Jefferson whether Johnson posed a serious and immediate threat.  He was wrestling with an officer who implied that the suspect was reaching for his gun, something the observing officer could not immediately rule out.  Plaintiff points to no cases holding that when faced with such split-second uncertainty about an individual's dangerousness, a police officer must limit himself to non-deadly force.  The Court itself is unaware of any precedent that would place such a question beyond debate.

In sum, although the Court cannot say as a matter of law that Jefferson did not violate Johnson's Fourth Amendment rights, it concludes that his conduct did not violate clearly established law.  As a result, summary judgment on Plaintiff's § 1983 claim against Jefferson is warranted.

* * *

This terminates the last of Plaintiff's federal-law claims.  Even so, the Court will continue to exercise supplemental jurisdiction over her remaining state-law claims.  Federal district courts are given supplemental jurisdiction over state claims that "form part of the same case or

controversy" as federal claims over which they have original jurisdiction.  See 28 U.S.C.

§ 1367(a).  "Even if only state-law claims remain[ ] after resolution of the federal question," a

district court has "discretion . . . to retain jurisdiction."  Schuler v. PricewaterhouseCoopers,

LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (quoting Osborn v. Haley, 549 U.S. 225, 245 (2007)).

When deciding whether to exercise supplemental jurisdiction over state claims, federal courts

should consider "judicial economy, convenience, fairness, and comity."  Shekoyan v. Sibley

Int'l, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S.

343, 350 n.7 (1988)).

 These factors weigh in favor of retaining jurisdiction here.  Both the parties and this

Court have invested significant time and resources in the litigation of this case.  After extensive

motions practice and discovery spanning multiple years, the parties are now on the eve of trial.

To dismiss the remaining claims and ask the parties to essentially restart in state court at this

juncture would be unfair and a waste of judicial resources.  "Considerations of judicial economy,

convenience and fairness to litigants . . . [thus] make it reasonable and proper" for this Court to

proceed on Plaintiff's state-law claims.  Osborn, 549 U.S. at 245.

 B. Assault and Battery Claims

 Defendants next move for summary judgment as to Plaintiff's assault and battery claims

against Jefferson, Ahmed, and the District, the last of which is included as a tortfeasor under a

respondeat superior theory of liability.  See MSJ at 32–34.

 Under D.C. common law, "[a]n assault is an intentional and unlawful attempt or threat,

either by words or acts, to do physical harm to the plaintiff.  A battery is an intentional act that

causes a harmful or offensive bodily contact."  District of Columbia v. Jackson, 810 A.2d 388,

392 (D.C. 2002) (quoting Holder v. District of Columbia, 700 A.2d 738, 741 (D.C. 1997)).

There is no dispute here that the assault and battery occurred. Instead, Defendants argue that the officers retained a qualified privilege to use that force, such that summary judgment in their favor is appropriate. See MSJ at 34. Under D.C. common law, qualified privilege is a defense to tortious liability that shields an officer's use of force in the course of his duties, so long as the force employed was reasonable. Evans-Reid v. District of Columbia, 930 A.2d 930, 937 (D.C. 2007).

In assessing whether qualified privilege applies, courts employ a "subjective and objective" test: "the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." Scales v. District of Columbia, 973 A.2d 722, 730 (D.C. 2009). Since most officers will subjectively believe themselves to be using a reasonable amount of force, qualified privilege tends to turn on the objective-reasonableness prong. District of Columbia v. Chinn, 839 A.2d 701, 706 (D.C. 2003). Both local and federal courts here have noted that this standard is "similar to the excessive[-]force standard applied in the Section 1983 context," and they often analyze the two in conjunction. Dormu v. District of Columbia, 795 F. Supp. 2d 7, 28 (D.D.C. 2011) (quoting Rogala v. District of Columbia, 161 F.3d 44, 57 (D.C. Cir. 1998)); see also Jenkins v. District of Columbia, 223 A.3d 884, 900 (D.C. 2020); Etheredge v. District of Columbia, 635 A.2d 908, 916 (D.C. 1993) (citing Supreme Court rule for Fourth Amendment excessive-force claims favorably in qualified-privilege analysis); Alston v. District of Columbia, 772 F. Supp. 3d 43, 67–68 (D.D.C. 2025) (applying same objective-reasonableness analysis to qualified privilege and qualified immunity); Ingram, 241 F. Supp. 3d at 149 (same). While qualified immunity and qualified privilege are distinct legal concepts, see Kotsch v. District of Columbia, 924 A.2d 1040, 1047 n.7 (D.C. 2007) (noting "theoretically different . . .

underpinnings between the defense of qualified privilege against common-law tort claims and qualified immunity from constitutional claims"), the objective-reasonableness analysis turns largely on the same reasoning.

### 1.    *Officer Jefferson*

Perhaps seeing the state of the caselaw, both parties rely entirely on their § 1983 arguments for their qualified-privilege analysis. See MSJ at 32; MSJ Opp. at 39. The Court, too, concludes that its earlier finding that Jefferson's use of deadly force was not objectively reasonable as a matter of law applies here with equal force. He is, accordingly, not entitled to qualified privilege, and these counts may proceed against him, as well as against the District for vicarious liability.

### 2.    *Officer Ahmed*

On the other hand, the assault and battery claims against Ahmed do not survive. Since he did not shoot Johnson, the § 1983 analysis is not relevant here. Any assault and battery necessarily would be grounded in some other unwanted contact. Here, the Court identifies two possible options, both of which would be shielded by qualified privilege.

First, the takedown. Plaintiff alleges at times that Ahmed and Jefferson employed a team takedown on Johnson after he resisted arrest. See MSJ Opp. at 14. She is somewhat inconsistent on this point, alternating between describing the takedown as performed by Jefferson alone and by both officers together. Compare id. ("Officer Ahmed assisted Officer Jefferson with conducting a team take-down on Mr. Johnson"), with Def. Rep. to SOF, ¶ 19 ("Defendant Jefferson conducted a tactical takedown on Mr. [*sic*] to better control and handcuff Mr. Johnson . . . ."). In any event, to the extent that Ahmed is alleged to have participated in the takedown, qualified privilege protects him from liability. Courts have frequently held that "the

use of takedowns is generally lawful when a suspect is resisting arrest." <u>Cooper v. District of Columbia</u>, 548 F. Supp. 3d 170, 181 (D.D.C. 2021) (citing <u>Jackson v. District of Columbia</u>, 327 F. Supp. 3d 52, 66 (D.D.C. 2018)); <u>see also</u> <u>Hargraves v. District of Columbia</u>, 134 F. Supp. 3d 68, 88 (D.D.C. 2015) (similar); <u>Armbruster v. Frost</u>, 962 F. Supp. 2d 105, 114 (D.D.C. 2013) (similar).

Similarly, if the claim is based on Ahmed's initial attempt to handcuff Johnson, that, too, is covered by qualified privilege. The force needed to effectuate an arrest certainly covers grabbing an individual's arm to handcuff him. <u>See</u> <u>Wasserman v. Rodacker</u>, 557 F.3d 635, 641 (D.C. Cir. 2009) (finding that even wrenching suspect's arm during arrest was reasonable because "[p]olice officers have authority to use 'some degree of physical coercion' when arresting a suspect") (quoting <u>Graham</u>, 490 U.S. at 396). The Court will thus grant summary judgment to Ahmed on the assault and battery claims.

      C.    <u>False-Arrest and False-Imprisonment Claims</u>

Next up are Plaintiff's false-arrest and false-imprisonment claims. <u>See</u> MSJ at 34–35. "In actions for false arrest and false imprisonment, the central issue is whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails." <u>Scott v. District of Columbia</u>, 493 A.2d 319, 321 (D.C. 1985) (quotation marks omitted); <u>accord</u> <u>Bradshaw v. District of Columbia</u>, 43 A.3d 318, 323 (D.C. 2012). To determine whether probable cause for arrest exists, courts look to "the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 56–57 (2018) (quotation marks and citations omitted). Although the question of probable cause often turns on questions of fact to be resolved by a jury,

"where the facts are undisputed or clearly established[,] . . . probable cause becomes a question of law for the court." Jenkins, 223 A.3d at 891 (quoting Enders v. District of Columbia, 4 A.3d 457, 469 (D.C. 2010)).  Accordingly, "judgment as a matter of law is appropriate in a wrongful arrest case if the evidence relevant to probable cause is 'so clear that reasonable men could reach but one conclusion.'" Id. (quoting Bradshaw, 43 A.3d at 324).

Here, based on undisputed facts, it is clear that Jefferson was justified in ordering Johnson's arrest.  Plaintiff concedes that Johnson had committed a felony (assault with a deadly weapon) two nights prior to the shooting, that the related BOLO that was issued included his photo, and that the police officers viewed and discussed the BOLO minutes before encountering Johnson in his apartment.  See Def. Rep. to SOF, ¶¶ 5, 9–10; Chrismer BWC at 16:41:20–29.  Under these circumstances, Jefferson certainly had probable cause to order Johnson's arrest.

Plaintiff argues that the arrest was pretextual because Jefferson did not order the arrest immediately upon seeing Johnson, but only after he began shouting at Taylor.  See MSJ Opp. at 39–40.  She alleges that the real reason the officers arrested Johnson was not his prior ADW, but because they wanted to de-escalate the situation, which is not a sufficient reason for arrest.  Id. Perhaps.  But pretextual motivations do not negate existing legal justifications for an arrest. Whren v. United States, 517 U.S. 806, 812 (1996) (holding that "an officer's motive [cannot] invalidate[] objectively justifiable behavior under the Fourth Amendment").  The Court will therefore grant summary judgment to Defendants on the false-arrest and false-imprisonment claims.

D.    Negligent-Supervision and Negligent-Training Claims

Moving to the final set of substantive claims, Defendants argue that summary judgment for Contee and the District is appropriate because Plaintiff never established a national standard of care as to negligent supervision and training.  See MSJ at 30–33.  The Court agrees.

As for other negligence claims, D.C. law requires plaintiffs in negligent-supervision and -training cases to establish (1) a standard of care, (2) defendant's deviation from that standard, and (3) a causal relationship between defendant's deviation and plaintiff's injury.  Messina v. District of Columbia, 663 A.2d 535, 537 (D.C. 1995); Clark v. District of Columbia, 708 A.2d 632, 634 (D.C. 1997).  Where the standard of care is not easily discernible to the average layperson, "the D.C. Court of Appeals has repeatedly found unguided resolution by lay persons inappropriate."  Briggs v. Wash. Metro. Area Transit Auth., 481 F.3d 839, 846 (D.C. Cir. 2007).  Instead, plaintiffs are expected to proffer expert testimony to help establish the relevant standard of care.  Lesesne v. District of Columbia, 146 F. Supp. 3d 190, 194 (D.D.C. 2015) ("[W]here the standard of care at issue arises from a particular occupational setting and depends on knowledge of typical practices by professionals of that occupation, a plaintiff cannot establish a negligence claim against such a professional — for actions taken in her professional capacity — without proffering expert testimony as to the standard of care particular to that occupational setting.").  For cases involving police misconduct, local courts have required that alleged tortfeasors be judged against a national standard of care.  See, e.g., Blair v. District of Columbia, 190 A.3d 212, 230 (D.C. 2018) (applying national standard of care to negligent-training and -supervision claims against MPD).

Plaintiff first argues that negligent-supervision and -training claims do not require expert testimony on the standard of care.  See MSJ Opp. at 41–44.  While this may be true in some

contexts, courts have routinely found that the supervision and training of police officers is a task for which expert testimony is required to establish the standard of care. Buie v. District of Columbia, 2023 WL 6142139, at *9 (D.D.C. Sep. 20, 2023) (collecting cases).

Plaintiff next asserts that if such testimony is required, her expert witness provided it. See MSJ Opp. at 43–44. An expert witness may not merely provide an opinion on "what he or she would do under similar circumstances" or "declare that [the defendant] violated the national standard of care." Clark, 708 A.2d at 635; accord Sherrod v. McHugh, 334 F. Supp. 3d 219, 258 (D.D.C. 2018). Instead, he must clearly relate the standard of care to the practices in fact generally followed by other comparable governmental entities or to some standard nationally recognized by such units. Clark, 708 A.2d at 635.

Here, Plaintiff's expert witness, Scott DeFoe, did articulate a standard of care, but it was neither national nor relevant. The parties agree that DeFoe stated that the standard of care for deploying lethal force is "predicated" on MPD department policy. See Def. Rep. to SOF, ¶ 40. But a department policy is not evidence of a national standard of care. See Sherrod, 334 F. Supp. 3d at 259 (accepting expert testimony on standard of care where expert studied police department policies nationwide and relied on the model policies of International Association of Chiefs of Police). Further, even if MPD's policy were a national standard of care, as Plaintiff argues, it would be a standard of care for the deployment of lethal force. In other words, DeFoe's testimony provides a framework for evaluating Jefferson's actions, but not for evaluating Contee's alleged negligence in the supervision and training of police officers. See Butera v. District of Columbia, 235 F.3d 637, 659 (D.C. Cir. 2001) ("The expert must . . . identify[] specific standards by which the jury could measure the defendant's actions."). As this is a fatal deficiency, the Court will grant summary judgment to Defendants on these claims.

E.    Damages

Defendants last argue that they are entitled to summary judgment on all types of damages apart from funeral expenses.  See MSJ at 35–37.  In their view, Plaintiff has not met her burden of providing a reasonable basis for the jury to calculate any other category of damages.  Id. Because Plaintiff's assault and battery claims as to Jefferson and the District are the only ones that may proceed to trial, the Court will assess what damages are available to Plaintiff for those claims.

"While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages."  Wood v. Day, 859 F.2d 1490, 1493 (D.C. Cir. 1988) (quoting Romer v. District of Columbia, 449 A.2d 1097, 1100 (D.C. 1982)) (internal quotation marks omitted and alteration in original).  "[R]ecovery of damages based on future consequences of a tort is available only if such consequences are reasonably certain. Unless there is nonspeculative evidence demonstrating that future suffering, additional medical expense, and loss of income will occur, the question should not be submitted to the jury."  Croley v. Republican Nat. Comm., 759 A.2d 682, 690 (D.C. 2000)

Plaintiff sues under both D.C.'s survival statute and its wrongful-death statute.  The two provide different types of damages: a survival action allows Plaintiff to recover damages on behalf of Johnson's estate for claims he himself could have pursued had he lived, whereas a wrongful-death suit allows Plaintiff to recover on behalf of Johnson's "spouse" and "next of kin" for the losses they have suffered as a result of his death.  Burton v. United States, 668 F. Supp. 2d 86, 97 (D.D.C. 2009).  The Court will analyze each kind of damages in turn.

1.    *Survival-Action Damages*

A suit under the D.C. Survival Act allows a decedent's estate to recover damages that would have been available to the decedent had he lived.  See D.C. Code § 12-101.  Here, Plaintiff seeks to recover medical expenses, lost wages, and damages for pain and suffering up until the time of death.  See Def. Rep. to SOF, ¶ 36.  Defendants counter that Plaintiff should be precluded from all three for lack of evidentiary proof.  See MSJ at 35–37.

The Court certainly agrees with the defense as to medical expenses.  Johnson's rapid death meant that he had no hospital expenses, and Plaintiff has not otherwise submitted any medical records or attempted to quantify medical expenses to any degree.  Such expenses are an economic loss, and "[u]nlike damages for pain and suffering . . . are not hard to quantify, and the Court will not excuse plaintiffs' failure to support" their claim "with competent evidence." Christie v. Islamic Republic of Iran, 2020 WL 3606273, at *23 (D.D.C. July 2, 2020) (quoting Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 71 (D.D.C. 2015)).  For these reasons, the Court finds that damages for medical expenses are not available at trial.

Similarly, Plaintiff has put forth insufficient evidence for a jury to award Johnson's lost wages.  On this front, she has submitted only nominally more than she did for medical expenses: a few intermittent employment records for Johnson that end in 2019, and then earnings of $385 in 2020 as reported to the Social Security Administration.  See MSJ at 36.  She did not provide additional salary information or any information on Johnson's certifications or skills.  Id. Further, Plaintiff has not retained a damages expert to aid the jury in estimating lost wages.  See Def. Rep. to SOF, ¶ 37.

To be clear, the lack of a robust employment history does not always preclude the recovery of lost wages.  See Forman v. Korean Air Lines Co., 84 F.3d 446, 449 (D.C. Cir. 1996)

(awarding lost wages based on expert calculation of average earnings for college-educated woman of decedent's age when decedent had limited employment history due to only having recently obtained a green card). And a damages expert is not strictly necessary to survive summary judgment. See Schleier v. Kaiser Found. Health Plan, 876 F.2d 174, 178 (D.C. Cir. 1989). The combination here, however, of no records and no expert is fatal for Plaintiff. Without clear-cut employment records, it becomes even more critical that Plaintiff supply a damages expert who could help the jury understand how to extrapolate from the limited employment records to a lifetime of lost wages. Id. at 179 ("Due to the ample testimony regarding Smith's employment history and background, we do not find that the district judge abused his discretion in not requiring expert testimony to prove lost future wages."). She did not do so, and it is ultimately unclear what exactly a jury would rely on here to award lost wages. For that reason, the Court finds that they are not available as damages.

Pain and suffering damages, however, do remain on the table. "While plaintiff may not be able to recover damages for lost future income without further proof of economic loss to the decedent's estate, damages for pain and suffering could be established without such proof." Dickens v. District of Columbia, 502 F. Supp. 2d 90, 93 (D.D.C. 2007). This is because "[i]n a survival action, circumstantial evidence is sufficient to support an award for the decedent's pain and suffering." Asal v. Mina, 247 A.3d 260, 277 (D.C. 2021); accord Capitol Hill Hosp. v. Jones, 532 A.2d 89, 92 (D.C. 1987) ("[T]he existence of pain and suffering could be inferred from the circumstances surrounding the decedent's death, which in this case were sufficient to permit the jury to make reasonable inferences."). Here, a jury could infer Johnson's pain and suffering based on the injuries "described in the record": the two gunshot wounds to his back. Bernard v. Calkins, 624 A.2d 1217, 1221 (D.C. 1993). Defendants argue that Plaintiff has not

submitted any evidence to quantify the amount of pain and suffering she seeks in damages.  See Def. Rep. to SOF, ¶ 36.  But "[p]ain and suffering damages are by their nature difficult to quantify."  Christie, 2020 WL 3606273, at *23.  Plaintiff is not required to ascertain the unascertainable.

In sum, Plaintiff has put forth sufficient evidence to proceed to trial on pain and suffering damages, but summary judgment is warranted on lost wages and medical expenses.

### 2.    *Wrongful-Death Damages*

In contrast to survival actions, wrongful-death suits "provide a remedy whereby close relatives of the deceased who might have expected maintenance or assistance from the deceased had he lived, may recover compensation from the wrongdoer commensurate with the loss sustained."  District of Columbia v. Hawkins, 782 A.2d 293, 303 (D.C. 2001) (quoting Semler v. Psychiatric Inst., 575 F.2d 922, 924–25 (D.C. Cir. 1978)).  Originally, under D.C. common law, "no civil action was maintainable . . . against a person for the wrongful death of another."  Semler, 575 F.2d at 924.  The District overrode this rule by statute when it created the Wrongful Death Act.  Id.  Under that Act, a decedent's personal representative may bring suit, see D.C. Code § 16-2702, and recover damages on behalf of the decedent's "spouse or domestic partner and the next of kin."  Id., § 16-2701.  A decedent's family can recover loss of financial support and burial expenses, as well as the value of non-pecuniary services the decedent would have provided, such as "loss of care, education, training, guidance and personal advice."  Hawkins, 782 A.2d at 303.  D.C. law, however, explicitly bars recovery for grief and emotional suffering.  Robinson v. District of Columbia, 130 F. Supp. 3d 180, 188 (D.D.C. 2015).

For the same reasons that the Court found that Plaintiff cannot recover for lost wages, she is also barred from recovering any monetary support for any of Johnson's next of kin.  Loss of

support is typically calculated as a portion of the decedent's lost wages, so if lost wages cannot be quantified with a reasonable certainty here, loss of support likewise stands unproven.  See Graves v. United States, 517 F. Supp. 95, 99 (D.D.C. 1981) (describing loss of support as plaintiff's portion of "the deceased's earnings multiplied by the decedent's work life expectancy and discounted to present worth").

As for loss of non-pecuniary services, Plaintiff contends that she proffered testimony from Taylor attesting to how Johnson supported her, her daughter, and their son by providing parental services, driving the children to activities and appointments, and serving generally as a father figure in the household.  See Def. Rep. to SOF, ¶ 36.  If credited by a jury, this evidence is sufficient to support a claim for loss of nonmonetary services.  See Doe v. Binker, 492 A.2d 857, 863 (D.C. 1985)  (affirming loss-of-services award based on decedent's wife's testimony that he "took care of the children on his days off, prepared meals for his family, took the children to the doctor and sporting events, performed home repairs, grocery shopping and other activities"); Flythe v. District of Columbia, 4 F. Supp. 3d 222, 236–37 (D.D.C. 2014) (noting that courts have varied in their use of expert testimony on loss-of-services calculations but finding no case that "required" expert testimony).

That recovery will be limited, however, to Johnson's son because Taylor was neither Johnson's spouse nor domestic partner as recognized under D.C. local law, and her daughter was not his "next of kin."  Although it is true that Taylor and her daughter lived in a household with Johnson, a family-like living arrangement is not sufficient to bring Taylor and her daughter into the statute's coverage.  See D.C. Code § 16-2701.  As a statute overriding common-law principles, the Wrongful Death Act is "strictly construed."  Sutton v. Washington Metro. Area Transit Auth., 2008 WL 8822521, at *1 (D.D.C. Aug. 27, 2008).  For example, another judge in

this district found that a decedent's long-term romantic partner could not recover under the Wrongful Death Act because she was not his spouse nor his registered domestic partner under the District's domestic-partnership registration requirements, even though the decedent himself had identified the plaintiff as his domestic partner in his will.  <u>Garza v. Trump</u>, 709 F. Supp. 3d 1, 5 (D.D.C. 2024).  Here, it is undisputed that Taylor is not Johnson's spouse nor registered domestic partner, and her daughter is not Johnson's next of kin.  Plaintiff therefore cannot recover any damages on their behalf.  Plaintiff herself is Johnson's mother, but she has put forth no evidence of his support of her, so loss-of-services damages also will not be available as to her in her personal capacity.  In sum, non-pecuniary loss-of-services damages will be available only for Johnson's son.

The parties agree that funeral expenses may be sought at trial.  <u>See</u> MSJ at 35; MSJ Opp. at 40.  The Court will therefore grant summary judgment to Defendants on damages, except as to pain and suffering, funeral expenses, and loss of non-pecuniary services as to Johnson's son.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment in part and deny it in part.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  <u>October 24, 2025</u>